# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>QARGO COFFEE, INC., a corporation,<br><br>MARK BASTOROUS, a/k/a Mark Bass and Mamdoh Bastorous, individually and as an officer of Qargo Coffee, Inc.,<br><br>BERNADETTE BASTOROUS, a/k/a Bernadette Shenouda and Bernadette Bass, individually and as an officer of Qargo Coffee, Inc., and<br><br>SAMIR SHENOUDA, individually and as an officer of Qargo Coffee, Inc.,<br><br>　　　　Defendants. | Case No. _1:24cv23978_____<br><br>**COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF** |

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.　　The FTC brings this action for Defendants' violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the FTC's Trade Regulation Rule entitled "Disclosure Requirements and Prohibitions Concerning Franchising," as amended (the "Franchise Rule"), 16 C.F.R. part 436.  For these violations, the FTC seeks relief, including a permanent injunction, monetary relief, and other relief, pursuant to Sections 13(b), and 19 of the FTC Act, 15 U.S.C. §§ 45(m)(1)(A), 53(b), 57b, and the Franchise Rule.

1

## SUMMARY OF THE CASE

2.      Since May 2020, Defendants have been selling a coffee shop franchise opportunity to prospective franchisees throughout the United States.  The franchise business model, like the one offered by the Defendants, enables franchisees to operate a business under the franchisor's trademark.  Often, franchises are marketed as a "business in a box," with franchisors promising substantial business assistance for franchisees.  These representations often appeal to individuals who want to own their own business despite having little or no prior experience running a company.  Given the franchise business model, the truthfulness of the franchisor's representations is vital—franchisees may rely on these assurances in entering long-term contracts and investing hundreds of thousands of dollars in their franchise, with many incurring significant debt in the process.

3.      Recognizing that the "serious information imbalance . . .  between prospective franchisees and their franchisors" had allowed "abuses" to "flourish[ ]" in the franchise market, the FTC issued the Franchise Rule. Original Franchise Rule Statement of Basis and Purpose, 43 FR 59614, 59624 (Dec. 21, 1978).  The Franchise Rule is a presale disclosure rule requiring a franchisor to provide to prospective franchisees a Franchise Disclosure Document ("FDD") at least 14 days before the franchisee makes a required payment or signs a binding contract.  The FDD must provide 23 items of material information, including information about the franchisor's executives, the franchisor's litigation and bankruptcy history, and how long it takes for franchises to get off the ground.  The Franchise Rule aims to protect consumers who seek to purchase a franchise by requiring that franchisors selling these opportunities provide clear and

accurate information about the franchise.  This information is critical for consumers to evaluate the costs and risks of any such opportunity, and to compare alternative offerings.

4.      Defendants failed to disclose the information required by the Franchise Rule, leaving prospective franchisees in the dark about crucial information important to deciding whether to invest in Defendants' franchise offering.  In California, Defendants failed to provide *any* FDDs—instead, they labeled their offering a "distributorship" and simply pretended that the regulation did not apply to them.  In other states, Defendants omitted critical information from their FDDs.  For example, Defendants failed to disclose two Defendants' history of filing for bankruptcy as well as Defendant Mark Bastorous's role in the marketing of a franchise later barred by several states and sued by the Department of Justice for deceptive practices.

5.      Defendants also have represented to consumers that they are likely to get their franchise up and running within 4 months from executing the franchise agreement.  But these representations are false, as Defendants are keenly aware that their franchisees have either failed to open at all, or have taken much, much longer to open.

6.      Between January 2021 and October 2023, the Defendants entered into 59 franchise and "distributorship" agreements with consumers, with the consumers paying more than $1.25 million to Qargo Coffee, Inc. for the opportunity to open a Qargo Coffee shop.

7.      Defendants' practices, as described in this Complaint, violate the Franchise Rule and Section 5 of the FTC Act.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355.

9.      Venue is proper in this District under 28 U.S.C. §§ 1391 (b)(2), (b)(3), and (c)(2), 1395(a), and 15 U.S.C. § 53(b).

## PLAINTIFF

10.     The FTC is an independent agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys. 15 U.S.C. §§ 41–58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Franchise Rule, 16 C.F.R. part 436, which is a presale disclosure rule requiring a franchisor to provide a franchisee with an FDD before the franchisee makes a required payment or signs a binding contract.

## DEFENDANTS

11.     Defendant Qargo Coffee, Inc. is a Delaware corporation with its principal places of business at 1200 Brickell Avenue, Suite 1260, Miami, FL 33131 and 701 Brickell Avenue, Suite 1550, Miami, FL 33131.  Qargo Coffee, Inc. transacts or has transacted business in this District and throughout the United States.  At all times relevant to this Complaint, acting alone or in concert with others, Qargo Coffee, Inc. has advertised, marketed, distributed, or sold franchise opportunities to consumers throughout the United States.

12.     Defendant Mark Bastorous, also known as Mark Bass and Mamdoh Bastorous ("Mark Bass"), is Qargo Coffee Inc.'s co-founder and has served as the company's Development Manager since at least July 2020.  At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Qargo Coffee, Inc., including the acts and practices

described in this Complaint.  Defendant Mark Bass, in connection with the matters alleged

herein, transacts or has transacted business in this District and throughout the United States.

13.     Defendant Bernadette Bastorous, also known as Bernadette Shenouda and

Bernadette Bass ("Bernadette Bass"), is Qargo Coffee Inc.'s co-founder and current President.

Mark Bass is her spouse.  From May 2020 until August 2023, she served as Qargo Coffee Inc.'s

Director of Product and Vendor Management.  At all times relevant to this Complaint, acting

alone or in concert with others, she has formulated, directed, controlled, had the authority to

control, or participated in the acts and practices of Qargo Coffee, Inc., including the acts and

practices described in this Complaint.  Defendant Bernadette Bass, in connection with the

matters alleged herein, transacts or has transacted business in this District and throughout the

United States.

14.     Defendant Samir Shenouda, a co-founder of Qargo Coffee, Inc., is Bernadette

Bass's father and Mark Bass's father-in-law.  He has served as Qargo Coffee, Inc.'s Chief

Executive Officer since May 2020 and was also the company's President from May 2022 until

August 2023.  At all times relevant to this Complaint, acting alone or in concert with others, he

has formulated, directed, controlled, had the authority to control, or participated in the acts and

practices Qargo Coffee, Inc., including the acts and practices described in this Complaint.

Defendant Samir Shenouda, in connection with the matters alleged herein, transacts or has

transacted business in this District and throughout the United States.

## COMMERCE

15.     At all times relevant to this Complaint, Defendants have maintained a substantial

course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act,

15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

### Mark Bass's Business Background and Bankruptcy

16.     Mark Bass has a background in quick-service-restaurant franchising both as a franchisee and with a franchisor.  In 2014, he and Bernadette Bass, along with partners, opened a Steak 'n Shake franchise outlet through an entity called Socal SNS LLC.  Their restaurant soon faced financial challenges.  In September 2016, a New York court entered a $285,000 judgment against the Basses in favor of a secured creditor that had purchased $380,000 of their outlet's future accounts receivable.

17.     On December 8, 2017, the Basses petitioned for Chapter 7 bankruptcy in the United States Bankruptcy Court for the Central District of California.  *See In re: Bastorous*, No. 6:17-bk-20092-MH (C.D. Cal. 2017).

18.     On the franchisor side, in or around 2017, Mark Bass began serving as the Florida development manager for the BurgerIM franchise system.  He organized two limited liability companies in connection with his work for BurgerIM.  He was the manager and registered agent for Burgerim Florida LLC, a Florida limited liability company that was organized effective June 5, 2017, and voluntarily dissolved on August 21, 2017.  He also served as the managing member and registered agent for Burgerim Florida, LLC, a Delaware limited liability company, which he registered with the Florida Department of State as a foreign entity on September 26, 2017.  On or around May 21, 2019, Mark Bass filed for reinstatement of that Delaware limited liability company with the Florida Department of State.

19.     Between 2017 and 2019, BurgerIM received tens of millions of dollars from the sale of more than 1,500 franchise outlets across the United States.  But most of those outlets never opened.  The Maryland Attorney General's office, the Washington Department of Financial Institutions, and the Indiana Secretary of State have issued orders prohibiting Burgerim Group USA from selling franchises in their respective states due to violations of their respective franchise laws.  In addition, on February 6, 2021, the CA Department of Financial Protection and Innovation (DFPI) issued a citation and cease and desist order against the Burgerim Group USA for injunctive and monetary relief under California law.

20.     The United States Department of Justice, on behalf of the FTC, filed suit against Burgerim Group USA and its chief executive officer, Oren Loni, on February 7, 2022, alleging violations of the Franchise Rule and Section 5 of the FTC Act.  On November 20, 2023, the United States District Court for the Central District of California entered a stipulated permanent injunction against the individual defendant and, on January 19, 2024, the court issued a default judgment against the corporate defendants.

21.      Although Mark Bass was not a party to any of the proceedings referenced in paragraphs 19 and 20, the CA DFPI's order found that BurgerIM's state-law violations included the company's failure to disclose his role as the Florida development manager and his 2017 bankruptcy petition.

## Mark Bass Creates Qargo Coffee

22.     On November 1, 2019, Mark Bass, through counsel, applied to the United States Patent and Trademark Office for a Qargo Coffee service mark for use with "coffee shops."  The application stated that mark consisted of "The Words 'Qargo Coffee' in capital letters with a

geometrical Q in between both words.  The background represents the metal container material that the store is built in."  In connection with that application, Mark Bass submitted a declaration averring that he was the owner of the mark.  That application eventually was abandoned, and Qargo Coffee, Inc. submitted other trademark applications in April 2021 and December 2021.

23.     On May 18, 2020, Mark Bass signed, on behalf of Qargo Coffee, Inc., a "National Supplier Agreement" with Lavazza Premium Coffees Corp.  That agreement, which was to take effect on June 1, 2020, established the terms under which Qargo Coffee, Inc. would purchase drip coffee and espresso from Lavazza, and Lavazza would lend coffee-making equipment to Qargo Coffee, Inc. for use in corporate-owned outlets.

24.     Two days later, on May 20, 2020, Qargo Coffee, Inc. was formed as a Delaware corporation.

25.     Qargo Coffee, Inc. has never owned any of its outlets.  Instead, since June 2020, the company has built its business through a franchise model.

### Qargo Coffee in California

26.     Mark Bass began marketing Qargo Coffee to prospective California franchisees no later than December 2020.  On one or more occasions, Qargo Coffee, Inc. has asked prospective purchasers of a California Qargo Coffee outlet to sign a "Mutual Nondisclosure Agreement" as a "Potential Franchisee" or as a "Prospective Licensee/Franchisee."  In addition, on one or more occasions, Qargo Coffee, Inc. has provided a "Brand Presentation" that included responses to "Frequently Asked Questions" about Qargo Coffee franchises to the prospective operator of a California Qargo Coffee outlet.

27.     In July 2021, months after Mark Bass began marketing Qargo Coffee to potential California franchisees, Qargo Coffee, Inc. applied to register to offer or sell its franchise with the CA DFPI, as required by California statute, California Corporations Code § 31110.  The company attached to its application a version of its June 7, 2021 FDD.  In Item 20, Table 5, of that FDD, Qargo Coffee, Inc. stated that the company had zero franchised outlets in California as of December 31, 2020, but projected that it would open four new franchised outlets in the state during the next fiscal year (i.e., 2021).

28.     To date, the CA DFPI has never registered Qargo Coffee, Inc. to sell franchises within California.  Nevertheless, Defendants have continued to market Qargo Coffee outlets within that state.

29.     Defendants have attempted to avoid California's franchise-registration law by characterizing their offering within that state—and only that state—as a "distributorship."  But Defendants' "distributorship" is simply a franchise by another name because it meets the definition of a "franchise" under the Franchise Rule.

30.     Qargo Coffee Inc.'s "distributorship" is, as set forth in 16 C.F.R. § 436.1(h), "a continuing commercial relationship, whatever it may be called," featuring (a) the right to operate a business associated with the franchisor's trademark, (b) the franchisor's promise or representation that it will exert significant control over, or provide significant assistance with operating, the business, and (c) the franchisee's making or committing to make a required payment.

31.     Qargo Coffee Inc.'s website has advertised four currently open California outlets: Qargo Coffee – San Jose, Qargo Coffee – Santa Monica, Qargo Coffee – Long Beach, and Qargo

Coffee – Fountain Valley.  The website has used the same naming convention for the company's outlets outside of California:  Qargo Coffee – Tampa, Qargo Coffee – Denver, and Qargo Coffee – Washington, DC. One "distributor" is quoted on Qargo's website as saying, "The rising product demand combined with the support from an experienced team like Qargo Coffee is the perfect recipe for success in a new business."

32.     Since 2021, Qargo Coffee, Inc. has entered into an "Affiliated License Agreement" with each of its open California outlets, as well as with other California outlets that either have closed or have not opened.  These Affiliated License Agreements refer to Qargo Coffee, Inc. as the "Supplier" and the outlet's operator as a "Distributor."  The Agreements provide that the "Distributor will be granted the exclusive rights to market, sell, distribute and service Supplier's Products within the Territory described hereafter," and that "neither supplier nor one of its affiliates, will open or operate another Qargo Coffee location within the territory." The Agreements also impose restrictions on the products that may be sold by "Distributors" by stating, "For the term of this Agreement, and for a period of twelve (12) months after the expiration or termination hereof, Distributor shall not under any circumstances, directly or indirectly through affiliates or other third parties, formulate, produce, market or sell its own, or cause to be formulated, produced, marketed or sold by any third party, which directly compete with or are similar to the Products without the written consent of Supplier."

33.     Qargo Coffee, Inc. has collected upfront payments, ranging from $10,000 to $45,000, from the operator of each of its California outlets.  The 2021 and 2022 Affiliated License Agreements described those payments as "training and store setup costs."  In some instances, the Affiliated License Agreements have contained a "payment schedule" specifying

10

that Qargo Coffee, Inc. had already received a deposit and that the operator would pay the remainder upon signing the Affiliated License Agreement, or that the operator would pay a portion upon signing the Affiliated License Agreement, with the remainder due upon signing a real estate lease.  Since 2023, the Affiliated License Agreement has required the outlet's operator to pay Qargo Coffee, Inc. a $30,000 fee, which is composed of $5,000 for "store interior design"; $10,000 for "marketing and development"; and $15,000 for "training and store setup." Under the Affiliated License Agreement, licensees cannot deploy certain marketing materials without Qargo Coffee Inc.'s approval, and must maintain insurance and records, which are subject to Qargo Coffee Inc.'s review for a period of time.

34.     On one or more occasions, Qargo Coffee, Inc. has participated in site selections or lease negotiations for a California Qargo Coffee outlet, or has provided a detailed "Franchise Brand Standard Manual" to the outlet's operator.

35.     On one or more occasions, Mark Bass has signed, on Qargo Coffee Inc.'s behalf, an "Equipment Loan Agreement" between Lavazza Premium Coffees Corp. and the operator of a California Qargo Coffee outlet.  These agreements have referred to both Qargo Coffee, Inc. and the outlet's operator as the "Customer."  They also have noted the operator's d/b/a name, such as "Qargo Coffee Santa Monica," "Qargo Coffee San Jose," or "Qargo Coffee Nordhoff."  The agreements have set forth the terms under which the California outlets would purchase drip

coffee and espresso from Lavazza, and Lavazza would lend coffee-making equipment to the outlets.

## Qargo Coffee Inc.'s Violative Disclosure Documents

36.     Since December 2021, Qargo Coffee, Inc. has been entering into franchise agreements for Qargo Coffee outlets outside of California, including in Colorado, Florida, Michigan, Nevada, North Carolina, Texas, and Washington, DC.

37.     In California, as discussed above, Defendants did not provide *any* FDDs to consumers. Outside of California, Qargo Coffee, Inc. has prepared FDDs dated June 2, 2020, June 7, 2021, April 30, 2022, and April 30, 2023.  But these FDDs failed to provide several pieces of required information, and misrepresented how long it was taking franchisees to get off the ground—a key metric for anyone considering opening a business.

38.     After opening a franchise, franchisees remain locked into contracts that bind the franchisee with significant consequences not only during but after the franchise term.  For example, should a franchisee who received incomplete disclosures later wish to leave the franchise system upon learning the omitted or inaccurate information, they would, per Qargo Coffee Inc.'s franchise agreement, be denied a refund of the hefty initial fees they paid to Defendants. In addition, they would be unable to open another coffee shop in another name for one year after the termination of the franchise agreement, due to a covenant not to compete clause.

### *Mark Bass's Involvement in the BurgerIM Franchise Offering*

39.     Under the Franchise Rule, Qargo Coffee, Inc. is required to disclose, in Item 2 of its FDD, the names and positions of its principal officers and those with management

12

responsibility for selling or operating the franchise, as well as their principal positions and employers during the preceding five years.  In Item 2 of its 2020, 2021, and 2022 FDDs, Qargo Coffee, Inc. did not disclose anything about Mark Bass and Bernadette Bass—two of the co-founders and active managers of the operation.

40.     Among other things, this meant that rather than provide notice of the Basses' employment history—one of the functions of the Franchise Rule—the FDDs did not provide any information about Mark Bass's involvement with the BurgerIM franchise offering.  Notably, dating as early as January 2020, the failures of the BurgerIM operation generated a raft of publicly available articles.  For example, on January 3, 2020, the Maryland Attorney General announced that it had issued a Stop Order suspending registration for the BurgerIM franchise.  In April 2021, BurgerIM was named as part of a report from Senator Cortez Masto about unfair practices in franchising.  And in February 2022, the Department of Justice (on behalf of the FTC) brought a law enforcement action against BurgerIM for enticing prospective franchisees with false promises while withholding information required by the Franchise Rule.

41.     By contrast, in Item 2 of its 2023 FDD, Qargo Coffee, Inc. disclosed that Bernadette Bass has served as the company's co-founder and director of product and vendor management since May 2020.  Qargo Coffee, Inc. also disclosed that Mark Bass has served as the company's development manager since July 2020, and that he was the president of CITI Investment Group in California from January 2016 until June 2020.  But it continued to omit anything about Mark Bass's involvement with the BurgerIM franchise, even though this information was required to be disclosed and would plainly be material to prospective franchisees deciding whether to invest tens of thousands of dollars in a new business.

*The Basses' Bankruptcy*

42.     Under the Franchise Rule, Qargo Coffee, Inc. is required to disclose, in Item 4 of its FDD, whether anyone with management responsibility for selling or operating the franchise has filed a petition or obtained a discharge under the United States Bankruptcy Code during the preceding ten years.  This information bears directly on the managerial ability of the parties with whom the prospective franchisee will be dealing.  Misrepresentations regarding this disclosure could result in drastic economic injury to franchisees.

43.     In Item 4 of its 2020, 2021, and 2022 FDDs, Qargo Coffee, Inc. stated: "No bankruptcy is required to be disclosed in this item."  This representation is false.  The Basses' bankruptcy filing should have been disclosed.  The Franchise Rule requires disclosure of any bankruptcy petitions, filed within the prior ten years, by officers or any other individual who will have management responsibility relating to the sale or operation of the franchise.  Qargo Coffee, Inc. failed to disclose the Basses' December 2017 bankruptcy petition.

44.     The Basses' bankruptcy is plainly material to prospective franchisees.  Learning of the bankruptcy would have yielded an opportunity to investigate the case filings and learn that the Basses estimated their liabilities at $10 million to $50 million, and that the debts were characterized as primarily business debts.  The bankruptcy petition also shows that many of the Basses' debts were between $100,000 and $500,000, and that there were eleven pending lawsuits against them, some of which included claims of fraud or racketeering.  Finally, the petition also reveals Mark Bass's employment with BurgerIM.  By hiding this information, the Defendants kept prospective franchisees from assessing the risk of investing tens of thousands of dollars into a franchise relationship with the Defendants.

45.     By contrast, in Item 4 of its 2023 FDD, Qargo Coffee, Inc. disclosed that the Basses filed a Chapter 7 bankruptcy petition in the Central District of California on December 8, 2017.  Qargo Coffee further disclosed that the bankruptcy court entered an order dismissing Mark Bass on September 30, 2020, and entered an order of discharge for Bernadette Bass on July 14, 2022.

*The Time it Takes for Franchise Openings*

46.     Under the Franchise Rule, Qargo Coffee, Inc. is required to disclose, in Item 11(2) of its FDD, the typical length of time it takes a franchisee to open an outlet after signing a franchise agreement or making a first payment for the franchise.  Failure to accurately disclose such information may mislead prospective franchisees as to when the business is likely to begin operating and could cause economic injury to franchisees who are unable to begin recouping their investment consistent with the disclosed time periods.

47.     In Item 11(2) of its 2020, 2021, 2022, and 2023 FDDs, Qargo Coffee, Inc. stated that it estimates a franchisee typically will open their Qargo Coffee location within 90-120 days of signing the franchise agreement.

48.     That estimate is inconsistent with the experience of Qargo franchisees.  To date, Qargo Coffee, Inc. has opened four outlets for which the operator signed a franchise agreement. The first, in Tampa, Florida, opened on or around September 22, 2022, more than six months after the franchisee signed the franchise agreement.  The second, in Denver, Colorado, opened on or around November 11, 2022, more than 10 months after the franchisee signed the franchise agreement.  And the company's two outlets in Washington, D.C. opened in or around February and March 2024, approximately 15 months after the franchisee signed the franchise agreement.

49.     Since December 2021, Qargo Coffee, Inc. also has entered into franchise agreements with numerous outlets that have not yet opened.

### Defendants Are Violating or Are About to Violate the Law

50.     Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission because, among other things:  Defendants engaged in their unlawful acts and practices repeatedly over multiple years; Defendants engaged in their unlawful acts and practices willfully and knowingly; Defendants earned significant revenues from participating in these unlawful acts and practices; and Defendants continue to market and sell Qargo Coffee franchise opportunities and maintain the means, ability, and incentive to continue their unlawful conduct at any time.

### VIOLATIONS OF THE FTC ACT

51.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

52.     Misrepresentations or omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

53.     Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid

16

themselves and that is not outweighed by countervailing benefits to consumers or competition.
15 U.S.C. § 45(n).

**Count I – Misrepresentations Regarding Length of Time to Open Outlets and Bankruptcy**

54.     In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of Qargo Coffee franchises, Defendants represent, directly, or indirectly, expressly or by implication that:

- the typical amount of time it would take a franchisee to open an outlet after signing a franchise agreement was 90-120 days; and

- there was no bankruptcy that was required to be disclosed to prospective franchisees.

55.     In truth and in fact, Qargo Coffee franchisees do not typically open their outlets within 90-120 days of signing a franchise agreement, and there was a bankruptcy that required disclosure to prospective franchisees.

56.     Therefore, Defendants' representations set forth in Paragraph 54 are false and misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act.

**Count II – Unfair Omissions**

57.     In numerous instances, Defendants have advertised, marketed, promoted, offered for sale, or sold Qargo Coffee franchises as a viable franchise opportunity, while omitting or concealing from prospective franchisees material information concerning the business history and experience of the officers.

58.     Defendants' acts or practices cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

59.     Therefore, Defendants' acts or practices, as described in Paragraph 57, constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n).

## VIOLATIONS OF THE FRANCHISE RULE

60.     The Franchise Rule defines "franchise" as any continuing commercial relationship or arrangement, whatever it may be called, in which the terms of the offer or contract specify, or the franchise seller promises or represents, orally or in writing, that:

(1)  The franchisee will obtain the right to operate a business that is identified or associated with the franchisor's trademark, or to offer, sell, or distribute goods, services, or commodities that are identified or associated with the franchisor's trademark;

(2)  The franchisor will exert or has authority to exert a significant degree of control over the franchisee's method of operation, or provide significant assistance in the franchisee's method of operation; and

(3)  As a condition of obtaining or commencing operation of the franchise, the franchisee makes a required payment or commits to make a required payment to the franchisor or its affiliate.  16 C.F.R. § 436.1(h).

61.     The Qargo Coffee opportunity sold by Defendants is a "franchise" pursuant to the Franchise Rule.

62.     Under the Franchise Rule, a "franchise seller" is a person that offers for sale, sells, or arranges for the sale of a franchise. It includes the franchisor and the franchisor's

employees, representatives, agents, subfranchisors, and third-party brokers who are involved in franchise sales activities.  It does not include existing franchisees who sell only their own outlet and who are otherwise not engaged in franchise sales on behalf of the franchisor.  16 C.F.R. § 436.1(j).  Defendants are "franchise sellers" pursuant to the Franchise Rule.

63.    A "franchisor" means any person who grants a franchise and participates in the franchise relationship.  Unless otherwise stated, it includes subfranchisors.  For purposes of this definition, a "subfranchisor" means a person who functions as a franchisor by engaging in both pre-sale activities and post-sale performance.  16 C.F.R. § 436.1(k).  Defendants are "franchisors" pursuant to the Franchise Rule.

64.    The Franchise Rule requires a franchisor to provide prospective franchisees with an FDD, which must be current, 16 C.F.R. § 436.2(a), and marked with an issuance date, 16 C.F.R. § 436.3(e)(6).  The franchisor must furnish a prospective franchisee with a copy of the franchisor's current FDD at least 14 days before the prospective franchisee signs a contract or makes a payment to the franchisor.  16 C.F.R. § 436.2(a).  The FDD must contain twenty-three categories (or "Items") of information.  Each Item typically is referred to by a number.

65.    Item 2 of the FDD must disclose the franchisor's principal officers and other individuals with management responsibility for the sale or operation of franchises, along with each officer's or other individual's principal positions and employers during the preceding five years.  16 C.F.R. § 436.5(b).

66.    Item 4 of the FDD must disclose whether any of the franchisor's officers or general partners, or other individuals with management responsibility relating to the sale or

operation of the franchise, have filed a petition or obtained a discharge under the United States Bankruptcy Code within the past 10 years.  16 C.F.R. § 436.5(d).

67.     Item 11(2) of the FDD must disclose the typical length of time to open the franchisee's business after the earlier of the signing of the franchise agreement or the franchisee's payment for the franchise.  It must also describe the factors that might affect this period of time.  16 C.F.R. § 436.5(k)(2).

68.     Under the Franchise Rule, "disclose" means to "present all material facts accurately, clearly, concisely, and legibly in plain English."  16 C.F.R. § 436.1(d).  "State," "describe," and "list" all have the same meaning as "disclose."  *Id*.

69.     Pursuant to Section 18(d)(3) of the FTC Act, 15 U.S.C. 57a(d)(3), and subparts B, D, and F, 16 C.F.R. § 436.2, § 436.6(a), and § 436.9, violations of the Franchise Rule constitute unfair or deceptive acts or practices in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

70.     In numerous instances, Defendants have failed to furnish prospective franchisees with an FDD, as required by the Franchise Rule.

71.     In numerous other instances, Defendants have furnished prospective franchisees with an FDD that fails to comply with the Franchise Rule's disclosure requirements.

72.     Defendants had knowledge of the requirements of the Franchise Rule as evidenced by the fact that they provided an FDD to certain prospective franchisees.

**Count III – Failure to Provide FDDs to Prospective Franchisees**

73.     In connection with the offering for sale and sale of franchises, as "franchise" is defined in 16 C.F.R. § 436.1(h), in many instances, Defendants have failed to furnish a

prospective franchisee with an FDD at least 14 days before the prospective franchisee signs a

contract with, or makes a payment to, Qargo Coffee, Inc., as required by 16 C.F.R. § 436.2(a).

74.     Therefore, Defendants have violated subpart B, 16 C.F.R. § 436.2(a) of the

Franchise Rule and Section 5(a) of the FTC Act.

### Count IV – Disclosure Violations

75.     In connection with the offering for sale and sale of franchises, as "franchise" is

defined in 16 C.F.R. § 436.1(h), in many instances, Defendants have furnished prospective

franchisees with FDDs that fail to: (1) include all of the information required by the Franchise

Rule, 16 C.F.R. § 436.5 and (2) follow the instructions for preparing disclosure documents set

forth in 16 C.F.R. § 436.6 of the Franchise Rule.  For example, Defendants have failed to

disclose in the FDDs they provide to prospective franchisees:

> (a) the name and position of the franchisor's directors, trustees, general
> partners, principal officers, and any other individuals who will have
> management responsibility relating to the sale or operation of the
> franchises, as well as their principal positions and employers during
> the past five years, along with the starting date, ending date, and
> location for each position, 16 C.F.R. § 436.5(b);

> (b) whether any officer or person with management responsibility relating
> to the sale or operation of the franchise has, during the preceding 10-
> year period, (i) filed a petition as a debtor under the United State
> Bankruptcy Code, or (ii) obtained a discharge of debts under the
> Bankruptcy Code, 16 C.F.R. § 436.5(d); and

      (c)  the typical length of time between the earlier of the signing of the

         franchise agreement or the first payment for the franchise, and the

         opening of the franchisee's business, 16 C.F.R. § 436.5(k)(2).

76.     Therefore, Defendants have violated subpart C, 16 C.F.R. § 436.5, and subpart D, 16 C.F.R. § 436.6, of the Franchise Rule, and Section 5(a) of the FTC Act.

**CONSUMER INJURY**

77.     Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the Franchise Rule and Section 5(a) of the FTC Act.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff requests that the Court:

A.     Enter a permanent injunction to prevent future violations of the FTC Act and the Franchise Rule by Defendants, and permit current franchisees to exit the franchise and rescind any related agreements, including noncompete clauses;

B.     Award monetary and other relief within the Court's power to grant, against Defendants;

C.     Award any additional relief as the Court determines to be just and proper.


Respectfully submitted,


Dated: 10/15/24

Christine M. Todaro
ctodaro@ftc.gov

22

Joshua A. Doan
jdoan@ftc.gov
Federal Trade Commission
600 Pennsylvania Ave., NW CC-6316
Washington, DC 20580
202-326-3711 (Todaro)
202-326-3187 (Doan)

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION